707 A.2d 493

CITY OF NEWARK, RONALD W. JEAN, DIRECTOR OF FINANCE AND MICHELLE R. JONES, TAX COLLECTOR OF THE CITY OF NEWARK, PLAINTIFFS–APPELLANTS/CROSS–RESPONDENTS, v. ESSEX COUNTY BOARD OF TAXATION, DEFENDANT–RESPONDENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 12, 1997—Reargued January
21, 1998—Decided April 8, 1998.

Before Judges LONG, KLEINER and KIMMELMAN.

*Salvatore Perillo* argued the cause for appellants/cross-respondents (*Perskie Nehmad & Perillo*, attorneys; *Mr. Perillo*, of counsel and on the brief).

*Joseph Fogelson*, Deputy Attorney General, argued the cause for respondent/cross-appellant (*Peter Verniero*, Attorney General, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel; *Mr. Fogelson*, on the brief).

*Saul A. Wolfe* argued the cause for intervenors Jose Gamez, Maria Gamez, Pilar M. Domingues, Ricardo Domingues, Antonio D. Paredes, Feleciano Pereira, Maria F. Pereira, Maria Ferreira,

Antonio Ferreira, Adelaide J. Cardoso, Isidro Letra, Dalila Cordeiro, Armando Ribeiro, Manuel C. Ribeiro, Horacio D. Carlos, Ana Carlos, Deolinda Amaro, Joao A. Amaro, Agostinho M. Costa, Joaquina F. Costa, Arnaldo Dos Santos, Maria Palmira Dos Santos, Osvaldo Da Fonseca, Antonio R. Vieira, Maria A. Vieira, Maria S. Rebelo, Anesia Ferreira, Marcos Machado Santos, Lucinea F. Santos, Arthur Fernandes, Paula Fernandes, Luis F. Nogueira, Paula Nogueira, Manuel Luis Silva, Deolinda DaSilva, Delfim M. Goncalves, Maria H. Goncalves, Marcia Carvalho, Augie Rei, Carlos Ferreira, Cecilia P. Ferreira, Filipe Cerqueira, Aida Cerqueira, Carlos Araujo, Cesaltina Araujo, Cesar G. Vaca, Rene Calvopina, Maria F. Marques, Ilidio Ferreira, Joao P. DaSilva, Vera L. DaSilva, Joao DaSilva, Maria DaSilva, Antonio Cabral and Emilia Cabral. (*Skoloff & Wolfe*, attorneys; *Mr. Wolfe*, of counsel; *Mr. Wolfe* and *Elizabeth Abramson Isser*, on the brief).

*Michael D. Bross* argued the cause for intervenors Joyce Branch, George Branch and Charles Cummings (*Bross Zipkin & Pinilis*, attorneys; *Mr. Bross*, on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

Article VIII, § 1, ¶ 1(a) of the New Jersey Constitution provides that "[p]roperty shall be assessed for taxation under general laws and by uniform rules [and] according to the same standard of value, except as otherwise permitted herein...." Consonant with this exception, effective December 4, 1975, Article VIII, § 1, ¶ 6 was added to the Constitution as an urban renewal incentive. It provides:

The Legislature may enact general laws under which municipalities may adopt ordinances granting *exemptions or abatements* from taxation on buildings and structures in areas declared in need of rehabilitation in accordance with statutory criteria, within such municipalities and to the land comprising the premises up which such buildings or structures are erected and which is necessary for the fair enjoyment thereof. Such *exemptions* shall be for limited periods of time as specified by law, but not in excess of 5 years. [*N.J. Const.* art. VIII, § 1, ¶ 6. (emphasis added).]

In 1989, in connection with the reenactment of the New Jersey Urban Enterprise Zones Act, *N.J.S.A.* 52:27H–60 to –95, the Legislature invoked Art. VIII, § 1, ¶ 6 of the Constitution and enacted *N.J.S.A.* 54:4–3.139 to –3.149, a statute designed, among other things, to encourage in "certain urban areas" "the construction of new single-family housing units" and "stimulate neighborhood revitalization." *N.J.S.A.* 54:4–3.139a–b. In so doing, the Legislature recognized that the deterioration of urban residential neighborhoods "is in large measure the result of the unwillingness of the owners of, and investors in, residential properties to properly maintain and improve their properties, arising out of fear of the resulting increase in property taxes." *N.J.S.A.* 54:4–3.139d. More particularly, the statute declared:

g. Further, while the rapidly growing demand for housing has begun to encourage some private investment in urban residential construction, the substantial property tax burdens in many of our urban areas have discouraged many prospective purchasers of newly constructed housing units in those municipalities;

h. These prospective purchasers may be further discouraged by the severe intramunicipal assessment discrepancies in certain urban areas, in which older residential properties remain assessed at a fraction of market value while newly constructed residential properties are assessed at full market values and the owners thereof pay substantially higher taxes than the owners of the older properties;

i. Property tax abatements for the construction of certain residential structures, and property tax abatements for the conversion of other structures to residential use, will constitute a substantial incentive for owners and investors to improve vacant land and underutilized structures;

j. The provision of property tax abatements for new residential structures in certain urban areas will assure the prospective purchasers of those properties that their property tax assessments will be no greater than the assessments of older homes, thus removing the fear of overly high tax burdens;

k. In certain urban areas, the encouragement of residential construction and conversion can be expected to make available older, more affordable housing stock, thus encouraging both the provision of affordable housing and general urban redevelopment, while in other urban areas, any new residential construction can be expected to contribute to the growth and neighborhood stability needed in conjunction with incentives for the rebirth of the business community;

*l.* Article VIII, Section I, paragraph 6 of the Constitution of this State authorizes the Legislature to enact general laws under which municipalities may adopt ordinances granting exemptions or abatements from taxation for limited periods of time not in excess of five years on buildings and structures in areas declared in need of rehabilitation in accordance with statutory criteria; and

m. It is, therefore, a compelling public purpose to provide qualified municipalities with the means of providing the appropriate abatements.

[*N.J.S.A.* 54:4–3.139g–m.]

The statute goes on to define an abatement as "an exemption from real property taxes provided for the purposes of encouraging residential construction, conversion, improvement and redevelopment pursuant to this act." *N.J.S.A.* 54:4–3.140.

The process by which a taxpayer may obtain an abatement is established in *N.J.S.A.* 54:4–3.141 which provides in relevant part:

> The governing body of a qualified municipality may, by ordinance, determine that one or more areas within the municipality are in need of rehabilitation, and that one or more buildings or structures in any such area could be advantageously converted to qualified residential property or that vacant land in any such area could be advantageously used for the construction of qualified residential property.

Upon a determination of qualification, *N.J.S.A.* 54:4–3.142 prescribes that a municipality may enact an abatement ordinance allowing property owners seeking to build or rehabilitate to apply for a five year abatement. The details of the application process are set forth in *N.J.S.A.* 54:4–3.144. A successful abatement applicant will be required to make a payment in lieu of taxes, pursuant to *N.J.S.A.* 54:4–3.145, on the improvement and continue paying taxes on the land on which the abated construction is situated, pursuant to *N.J.S.A.* 54:4–3.148.

In 1990, the city of Newark, in turn, enacted an Ordinance which created the five year tax abatement program authorized by *N.J.S.A.* 54:4–3.139 to –3.149. Under the program, during the five year term of the abatement, the governing body was authorized to receive a payment in lieu of taxes of 2% of the cost of the improvement or conversion. In addition to these payments, the owner also was required to pay all property taxes assessed and levied against the land underlying the abated improvement or conversion.

In 1991, the Legislature recognized that its abatement program had run into difficulty because, at the end of the five year abatement period, abated properties

face severe intra-municipal assessment discrepancies in urban municipalities that have not kept their assessments current. In such municipalities older residential properties often remain assessed at a fraction of market value, while the newly constructed residential properties after the five-year tax abatement grant is terminated are forced to pay substantially higher property taxes than the owners of the older residential properties.

> [Senate County and Municipal Government Committee Statement, Senate No. 3690, *L.* 1991, *c.* 469.]

The effect of this state of affairs was to discourage residential redevelopment because the short term benefit of the abatement was outweighed by the long term detriment of paying substantially higher taxes than other urban neighbors. In an effort to ameliorate this difficulty, the Legislature amended the statute by enacting *L.* 1991, *c.* 469, § 1 ("Chapter 469") which created a transitional program to ease the reentry of abated properties onto the tax rolls in municipalities which have not revalued within recent memory. In so doing, the Legislature noted:

> Providing uniform tax treatment for new residential structures in urban areas that had received a five-year tax abatement will assure current and prospective owners of those properties that their property tax payments will be similar to the property tax payments of older homes, thus removing the fear of disproportionately high tax burdens being placed on those new residential structures.
>
> This bill accomplishes such uniform tax treatment by directing that annual tax payments of such structures be computed in the sixth and subsequent tax years by multiplying the certified average ratio, used for determining the common level range for each taxing district pursuant to P.L. 1973, c. 123 (C. 54:1–35b) as prepared by the Director of the Division of Taxation for the preceding tax year, times the taxes otherwise due on that structure. This annual tax equalization procedure will continue through the tax year before a municipal wide revaluation is implemented. In the revaluation tax year and thereafter the tax abated structure will be valued and taxed like all other similar residential structures in the municipality.
>
> The committee amended the bill to clarify the definition of "equalized taxes otherwise due" and provide that no appeal shall be taken by the property owner from the determination by the tax collector of equalized taxes otherwise due, except for mathematical or typographical errors. Additionally, the committee amended the bill to establish as a floor for the "equalized taxes otherwise due" the total property tax payment on the structure prior to any tax deduction payment due and payable during the third tax year following completion of construction, improvements or conversion alterations pursuant to section 7 of P.L. 1989, c. 207 (C. 54:4–3.145).
>
> [Senate County and Municipal Government Committee Statement, Senate No. 3690, *L.* 1991, *c.* 469.]

Chapter 469 provides that after the end of the fifth year of abatement, and until revaluation, the owner shall pay 100% of the "equalized taxes otherwise due." *N.J.S.A.* 54:4-3.145b. "Equalized taxes otherwise due" is defined as:

> [T]he tax amount derived by levying on a structure for which a five-year tax abatement has been granted, a property tax imposed in the same manner as other property taxes are levied pursuant to chapter 4 of Title 54 of the Revised Statutes, except that for all tax years subsequent to the last tax abatement year including and ending in the tax year prior to a municipal-wide revaluation, the total property tax prior to any tax deduction shall be equalized by the tax collector by multiplying that amount times the average ratio of the taxing district, but in no event shall the payment for equalized taxes otherwise due be less than the total property tax payment on the structure prior to any tax deduction due and payable during the third tax year following completion of construction, improvements or conversion alterations pursuant to section 7 of P.L.1989, c. 207 (C. 54:4-3.145). No appeal shall be taken by the property owner from the determination by the tax collector of equalized taxes otherwise due, except for mathematical or typographical errors.
>
> [*N.J.S.A.* 54:4-3.140.]

Newark, thereafter, amended its ordinance to implement the provisions of Chapter 469. The amended ordinance incorporates the language of the amended statute and provides that in the sixth and subsequent years, by financial agreement, the owner of the previously abated property shall pay, with respect to the improvement, the "equalized taxes otherwise due" as it is specifically defined in *N.J.S.A.* 54:4-3.140, *supra.* Further, Newark's ordinance authorizes the financial agreement under it to be extended for up to 25 years to owners of residential properties. (Obviously, if revaluation occurs before the 25 year cutoff, the ordinance will cease to be authorized under Chapter 469 which applies only up to a revaluation. To that extent, the longevity of the transitional plan is in the hands of Newark.)

On September 20, 1996, the Attorney General issued a legal opinion to the Essex County Board of Taxation (the "County") setting forth his interpretation of Chapter 469 as it relates to the properties whose five year abatements had expired. The sum and substance of his opinion was that "the City of Newark must tax each of the Properties, upon the expiration of its five-year abatement, based upon the same standard of value and the same tax

rate used to assess other real properties in the City pursuant to *N.J.S.A.* 54:14-1 *et seq.* (and in accordance with the City's Chapter 123 ratio)."[1]  In other words, the Attorney General opined that, after the fifth year, previously abated properties should be treated the same as all other properties in Newark.  On September 23, 1996, the County notified Newark's Tax Assessor of the Attorney General's opinion and advised her to "assess those properties for which five-year abatements have expired in accordance with the opinion...."

Newark disagreed, arguing that Chapter 469 provides a distinct methodology for treatment of previously abated residential properties.  This methodology is to carry out the legislative plan to ease reentry of the abated properties onto the tax rolls after expiration of the five year abatement.  More particularly, Newark took the position that the Chapter 123 ratio has to be applied twice to previously abated properties, subject only to the limit in that statute which states that taxes should not be less than the amount due in the third year of the five year abatement period under *N.J.S.A.* 54:4-3.145b or c(3).  According to Newark, only this reading of the statute would align the tax treatment accorded previously abated residential properties with that accorded older residential properties whose value is artificially depressed because Newark has not recently revalued.  The differing views of the County and Newark could not be reconciled.

This stalemate resulted in the litigation at hand.  Newark filed a law suit seeking to compel the tax collector to calculate the tax bills for 77 properties whose abatements had expired in accordance with its interpretation of *N.J.S.A.* 54:4-3.140 and to have the County treat these properties as other than taxable in calculating school, county and municipal taxes.  The County filed a cross-motion for summary judgment denying the relief sought in New-

---

[1] A taxing district's "Chapter 123 ratio" is the average ratio of assessed value to fair market value for all taxable properties in the taxing district as certified by the Director, of the Division of Taxation.  *See N.J.S.A.* 54:1-35a.

ark's complaint on the basis that Newark's interpretation violates Art VIII, § 1, ¶ 6 of the New Jersey Constitution by extending the abatement beyond five years. The parties agreed that if Newark prevailed on the first issue (the tax calculation) it would necessarily prevail on the second.

The tax court judge was faced with several questions. The first was the meaning of the "equalized taxes otherwise due" language of Chapter 469. He held that, in light of the Legislature's expressed intent in enacting Chapter 469, Newark's interpretation of the statute was the correct one. He went on to rule that to the extent that this interpretation results in property tax relief of more than five years, it violates the five year limit on exemptions and abatements in Art. VIII, § 1, ¶ 6 of the New Jersey Constitution. In so doing, he accepted the County's contention that the failure of the framers to add the word "abatements" to the second sentence of Art VIII, § 1, ¶ 6 was inadvertent and that the history of that paragraph reflects no distinction between the definitions of the two terms (exemption and abatement) and no differentiation in their treatment. He also noted that in the years following the adoption of Art. VIII, § 1, ¶ 6 "no statute purported to extend its benefits beyond 5 years" thus establishing a consistent legislative interpretation of Art. VIII, § 1, ¶ 6 consonant with that of the County. He ordered:

Summary judgment, with prejudice, is hereby granted to the defendant, Essex County Board of Taxation, declaring that the City of Newark's Tax Collector should prepare and issue a 1997 tax bill with respect to the improvements portion of each property that is a subject of the plaintiffs' complaint in an amount determined by multiplying (1) the assessment of such improvements by Newark's Tax Assessor as listed on Newark's 1997 Tax Lists submitted by Newark's Tax Assessor to the defendant on or about January 10, 1997 (which assessments have taken into account Newark's Chapter 123 ratio), by (2) the real property tax rates computed for Newark by the defendant for the tax year 1997.

All parties and the tax court judge agree that under this order, taxes imposed on previously abated properties will be greater than those imposed on other residential property in Newark.

Newark appeals from the judgment entered against it which declared the "equalized taxes otherwise due" provision of Chapter

469 unconstitutional to the extent that it grants tax relief of more than 5 years. The County cross-appeals, contending that the tax court judge was mistaken in his conclusion that the effect of the "equalized taxes otherwise due" language is an abatement of greater than five years duration and that, in fact, the statute requires previously abated properties to be treated like all other properties after five years. We granted citizens affected by the declaration that Chapter 469 is unconstitutional the right to intervene.

*I*

On appeal, as at trial, the arguments of Newark and the County clash on two fronts: the meaning of Chapter 469 and the meaning of Art. VIII, § 1, ¶ 6. We turn first to the meaning of Chapter 469 because if we were to agree with the County's interpretation of that statute, the constitutional question would evaporate. Unfortunately, we do not. We are in full agreement with the tax court judge's conclusion that Newark's reading of this statute is the correct one. This conclusion is compelled by the plain language of the statute which provides that during the relevant period (after the five year abatement but before revaluation), the "total property tax" on previously abated properties shall be "equalized by the tax collector by multiplying *that amount* times the average ratio of the taxing district...." *N.J.S.A.* 54:4–3.140. (emphasis added). "That amount," is not the value of the property but the *tax* which has been derived from a previous application of the Chapter 123 ratio to value. *Ibid.* In other words, the unambiguous language of Chapter 469 requires two applications of the Chapter 123 ratio. As the tax court judge recognized, our duty is to carry out the legislative intent as expressed by the clear language of the statute, not to presume that the Legislature meant something other than what it said. *In re Closing of Jamesburg High Sch.*, 83 *N.J.* 540, 548, 416 *A.2d* 896 (1980); *Essex Crane Rental Corp. v. Director, Div. on Civil Rights*, 294 *N.J.Super.* 101, 105, 682 *A.2d* 750 (App.Div.1996).

But even if we viewed Chapter 469 as, in some way, ambiguous (which we do not) that ambiguity would be laid to rest in favor of two applications of the Chapter 123 ratio by resort to the legislative and historical material surrounding its enactment. *New Jersey Pharmaceutical Ass'n. v. Furman*, 33 *N.J.* 121, 130, 162 *A.*2d 839 (1960). Those materials, including sponsor statements, unequivocally express that the legislative will undergirding Chapter 469 was to ease the reentry of previously abated residential property onto the tax rolls in municipalities which have not revalued in recent memory. Just the opposite would occur if we were to interpret the statute as the County suggests. Under that interpretation, previously abated property would not only not be eased back onto the tax rolls but would be taxed much more heavily than surrounding residential property which has not recently been revalued. This is clearly not what the Legislature intended.

The County's alternative suggestion (that its interpretation of Chapter 469 must be accepted in order to avoid declaring the statute unconstitutional) is equally unavailing. To be sure, it is our duty to construe a statute so as to render it constitutional if it is reasonably susceptible to such an interpretation. *State v. Profaci*, 56 *N.J.* 346, 350, 266 *A.*2d 579 (1970) (citing *Woodhouse v. Woodhouse*, 17 *N.J.* 409, 416, 111 *A.*2d 631 (1955)). However, the value informing this canon of statutory interpretation is to *save* the statute and thus carry out the legislative will. Here, while the County's interpretation of Chapter 469 would avoid a constitutional challenge, it would also effectively gut Chapter 469 and render it meaningless verbiage. In our view, "saving" the statute from constitutional attack by rendering it impotent is no save at all. In such circumstances, the canon cited by the County cannot carry the day. In sum, we affirm the tax court judge's determination as to the meaning of Chapter 469.

## II

We turn next to the tax court judge's conclusion that Art. VIII, § 1, ¶ 6 of the New Jersey Constitution limits abatements to

five years. As the trial judge recognized, this is a difficult question. On the one hand there is the literal language of Art. VIII, § 1, ¶ 6 which provides:

> The Legislature may enact general laws under which municipalities may adopt ordinances granting *exemptions or abatements* from taxation on buildings and structures in areas declared in need of rehabilitation in accordance with statutory criteria, within such municipalities and to the land comprising the premises upon which such buildings or structures are erected and which is necessary for the fair enjoyment thereof. Such *exemptions* shall be for limited periods of time as specified by law, but not in excess of 5 years.
>
> [*N.J. Const.* art. VIII, § 1, ¶ 6. (emphasis added).]

From this language, Newark makes one powerful argument: that the plain words of this provision are dispositive in that they clearly exclude abatements from the five year limit.

The County's arguments are no less compelling: that an abatement is a type of an exemption and that the terms have been used interchangeably thus clouding the meaning of Art. VIII, § 1, ¶ 6; that the longstanding legislative and executive construction of Art. VIII, § 1, ¶ 6 supports the application of the five year limit to both exemptions and abatements; and that the common sense of the situation compels the conclusion that the five year limit applies to abatements as well as exemptions. Like the tax court judge, we think the County has the better argument.

We begin with the terms exemption and abatement. "Abatement" is defined in *Webster's Third New International Dictionary* 2 (1981) as a "decrease, deduction ... a deduction from the full amount of a tax." In *Black's Law Dictionary* 4 (6th ed.1990) "abatement" is defined as a "reduction, a decrease, or a diminution ... [a] diminution or decrease in the amount of tax imposed." "Exemption,"on the other hand, is defined as "freedom from any charge or obligation to which others are subject: immunity." *Webster's Third New International Dictionary* 795 (1981). Further, *Black's Law Dictionary* 571 (6th ed.1990) defines "exemption" as "[f]reedom from a general duty or service; immunity from a general burden, tax or charge." These definitions essentially accord with the parties' view of the terms. They agree that the difference is merely quantitive: *i.e.,* an abatement is a kind of an

exemption which excludes part of the value of property (as opposed to all) from taxation. In other words, an exemption implies freedom from payment while an abatement carries with it some obligation for payment. Thus an abatement is a partial exemption.

That this is so is revealed by the statutes enacted under Art. VIII, § 1, ¶ 6. *N.J.S.A.* 54:4–3.140 specifically defines an abatement as an "exemption." Likewise *N.J.S.A.* 54:4–3.73f;[2] *N.J.S.A.* 54:4–3.122; and *N.J.S.A.* 40A:21–2 all define abatement as that portion of the assessed value of property prior to improvement which is "exempted" from taxation. Moreover, while the Blight Provision of the Constitution, Art. VIII, § 3, § 1, only provides for "exemptions" to encourage rebuilding in blighted areas, *N.J.S.A.* 40A:12A–50d, enacted under its authority, prescribes a tax *abatement* thus confirming the parties' view of abatement as included within the broad contours of the term exemption.

We note as well that although denominating various tax programs differentially as exemptions and abatements, the Legislature has utilized the payment in lieu of taxes formula for both. For example, the "exemption" in *N.J.S.A.* 40A:20–12b requires a payment "in lieu of taxes" as do the "exemptions" and "abatements" under *N.J.S.A.* 40A:21–10; and the "abatements" under *N.J.S.A.* 54:4–3.10la and *N.J.S.A.* 40A:12A–50d. We make this observation to underscore the fact that the Legislature effectively has treated the term exemption as encompassing abatement. In our view this casts a shadow over the clarity of the language of Art. VIII, § 1, ¶ 6 insofar as it can be argued that an abatement, by its very nature, falls within the sentence limiting exemptions to five years. At the very least, it requires us to look beyond the words themselves in interpreting this constitutional provision.

---

[2] This statute was originally enacted under Art. VIII, § 3, ¶ 1 several months prior to the approval of Art. VIII, § 1, ¶ 6. Its 1977 version however references Art. VIII, § 1, ¶ 6 as its enabling authority.

This brings us to the long-standing legislative interpretation accorded Art. VIII, § 1, ¶ 6. Our research reveals that every single one of the five statutes which has been enacted pursuant to the authority of Art. VIII, § 1, ¶ 6 over the past thirty years has specifically applied the five year limit to abatements as well as to exemptions, *N.J.S.A.* 54:4–3.72 to –3.79; *N.J.S.A.* 54:4–3.95 to––3.112; *N.J.S.A.* 54:4–3.121 to –3.129; and *N.J.S.A.* 40A:21–1 to –21 (the recodification of the three previous statutes) as well as the statute at hand *N.J.S.A.* 54:4–3.139 to –3.149.

Likewise, when Governor Kean was faced with an earlier version of *N.J.S.A.* 54:4–3.139 which allowed fifteen year tax abatements, he vetoed it with the following message:

I support the underlying purpose of this bill but must return it to the Legislature for further consideration given mandates contained in the New Jersey Constitution. Under our Constitution, it is not possible to grant 15–year tax abatements to individuals who wish to construct residences on vacant lots or convert underutilized structures into residences. Article VIII, Section I, paragraph 6 of the Constitution permits the Legislature to enact general laws under which municipalities may adopt ordinances granting exemptions or abatements from taxation for buildings and structures in areas declared in need of rehabilitation, but these abatements are constitutionally limited to five years in duration. While the Constitution does permit longer tax abatements for public or limited-profit entities engaged in revitalization of blighted areas, this bill is not limited to these public or limited-profit entities or to blighted areas.

As a result, I suggest modifying this bill to limit the duration of a tax abatement under this legislation to the five-year period permitted by the Constitution.

[Governor Kean, *A Letter to the General Assembly, on Senate Bill No. 1966 and Assembly Bill No. 2618* (1989).]

Thereafter, the statute was amended to its present form.

Further, no learned treatise nor scholarly work that we have been able to uncover suggests that the five year limit in Art. VIII, § 1, ¶ 6 applies only to exemptions and not abatements. Indeed, a noted New Jersey Constitutional scholar has said just the opposite. Professor Robert F. Williams unequivocally states that Art. VIII, § 1, ¶ 6 "permits the legislature to delegate to municipalities the power to grant up to five-year tax exemptions *and abatements* for buildings in areas in need of rehabilitation." Robert F. Williams, *The New Jersey Constitution: A Reference Guide* 114 (1997). (emphasis added).

Finally, and most important to us is our faith in the common sense of the Joint Legislative Committee which prepared Art. VIII, § 1, ¶ 6 for adoption. If the difference between an exemption and an abatement is only whether all or some of the value of property is excluded from taxation (and all parties seem to agree that this is the distinction) it is impossible for us to conceive of a reason why the framers, who felt the need to place a finite limit on the relief granted under that section, would limit a 100% tax exemption to five years but allow a 99% abatement to go on forever. That is the effect of the conclusion that abatements are outside the scope of the limit. In this respect, we are especially persuaded by the fact that neither the public question nor the explanatory material appended to the proposed Art. VIII, § 1, ¶ 6 discussed the five year limit, or distinguished between exemptions and abatements in terms of such a limit. If the rather startling theoretical result to which we have adverted (a five year limit on a 100% exemption but no limit on a 99% abatement) was intended, we think the framers of Art. VIII, § 1, ¶ 6 would have said so. In short, while we recognize the difficulty of this question, we are persuaded, as was the tax court judge, that the use of the word exemption in the second sentence of Art. VIII, § 1, ¶ 6 was meant to subsume the lesser abatement. We thus affirm the tax court judge's conclusion to that effect.

## III

This does not end our inquiry however. The final question which needs to be addressed is whether Chapter 469 constitutes an abatement.[3] The tax court judge obviously viewed it that way to the extent that he invalidated it under Art. VIII, § 1, ¶ 6. It is here that we part company from him.

---

[3] If only the basic abatement statute had been at issue, the question of whether Art. VIII, § 1, ¶ 6 limited abatements as well as exemptions to five years would have been avoided altogether because *N.J.S.A.* 54:4–3.140 defines abatement as an "exemption" from property taxes.

Unlike the County and the tax court judge, we do not read Chapter 469 as evidence that the Legislature mistakenly thought that abatements could extend beyond five years. On the contrary, in enacting Chapter 469, the Legislature specifically recognized the viability of the five year limit on abatements in its statement of intent to "provid[e] uniform tax treatment" to structures in "urban areas that *had received a five-year tax abatement.*" Senate County and Municipal Government Committee Statement, Senate No. 3690, *L.* 1991, *c.* 469. (emphasis added). This recognition is also evident from the statutory language which makes Chapter 469 effective upon the *expiration* of the five year abatement. Further, no other statute providing an exemption or an abatement has ever utilized the "equalized taxes otherwise due" formulation.

The point is that the Legislature knew and understood the limits of the Constitution and had experience formulating "abatement" provisions when it enacted Chapter 469. Its statement of intent and its use of language reveal that it did not consider Chapter 469 to be an abatement at all but a transitional phase-in program for previously abated property. Its purpose was to avert the "severe intra-municipal assessment discrepancies in urban municipalities that have not kept their assessments current" and to remove "the fear of disproportionately high tax burdens being placed on those new residential structures." Senate County and Municipal Government Committee Statement, Senate No. 3690, *L.* 1991, *c.* 469. Without removing that fear, the "residential construction, conversion, improvement and redevelopment" in urban areas in need of housing, which the Constitution and the statute were specifically enacted to engender, would not occur. *N.J.S.A.* 54:4–3.140. Obviously, the Legislature was concerned with the perception of homeowners that what was being given with the right hand (an abatement) was being taken back with the left (disproportionately high taxes after the abatement period expired due to failure to revalue). Recognizing that without creating a transitional phase-in program, the abatement scheme could not fully succeed, the Legislature created Chapter 469 *not as an abatement* but as an equalization scheme to assure that the five

year abatement program was successful in encouraging rebuilding. Chapter 469 guaranteed that the benefits of the abatement program would not be watered down by the detriment of taxes disproportionate to those paid by other residential homeowners, in the sixth and subsequent years. In so doing, it assured that the goals of the abatement program (renovation and redevelopment), which were important enough to warrant a constitutional amendment, came to fruition.

At the same time, the Legislature took a step toward the uniformity envisioned by Art. VIII, § 1, ¶ 1(a) which is a goal that is simply not instantly attainable. *Switz v. Township of Middletown*, 23 *N.J.* 580, 594, 130 *A.*2d 15 (1957). *New Jersey Chapter, Am. Inst. of Planners v. New Jersey State Bd. of Professional Planners*, 48 *N.J.* 581, 602, 227 *A.*2d 313 (1967) (determining that legislative reform of an equal protection violation "may proceed one step at a time" and it "does not demand immediate logical tidiness; nor is it violated because the legislation as enacted does not bring about the full reform or result intended to be produced."), *cert. denied*, 389 *U.S.* 8, 88 *S.Ct.* 70, 19 *L.Ed.*2d 8 (1967). By tying the operation of Chapter 469 to revaluation, the Legislature created a theoretical incentive for revaluation which is "an absolute essential, particularly in times of continuous fluctuation of realty values, to accomplish the constitutional and statutory imperative of uniform and non-discriminatory taxation." *Essex County Bd. of Taxation v. City of Newark*, 73 *N.J.* 69, 72, 372 *A.*2d 607 (1977). We are satisfied that this transitional scheme to assure that the abatement program is a success and to move in the direction of uniformity by encouraging revaluation was within the power of the Legislature. We thus reverse the order declaring it unconstitutional.

Affirmed in part; reversed in part.